IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS; CENTER FOR
BIOLOGICAL DIVERSITY; WILDEARTH
GUARDIANS; PREDATOR DEFENSE; and
PROJECT COYOTE-a project of Earth Island
Institute,

        Plaintiffs,

        v.

DAVID WILLIAMS, in his official capacity
Oregon State Director for USDA-APHIS
Wildlife Services; ANIMAL AND PLANT
HEALTH INSPECTION SERVICES-
WILDLIFE SERVICES, an agency of the
United States Department of Agriculture; and
UNITED STATES DEPARTMENT OF
AGRICULTURE, a federal department.

        Defendants.

Civ. No. 6:16-cv-00177-MC

OPINION AND ORDER

**MCSHANE, Judge**:

    Before this Court is Plaintiffs' Motion for Summary Judgment (ECF No. 20) and Defendants' Cross-motions for Summary Judgment (ECF NO. 27). Plaintiffs, collectively referred to here as Cascadia Wildlands, comprise of a group of five wildlife enthusiasts and advocacy organizations: Cascadia Wildlands, Center for Biological Diversity, WildEarth

Guardians, Predator Defense, and Project Coyote. The three defendants are David Williams, USDA-APHIS Wildlife Services[1], and United States Department of Agriculture.

Upon preparation and review of an Environmental Assessment (EA), defendant USDA-APHIS Wildlife Services agency (Wildlife Services) concluded that their involvement in the implementation of Oregon's wolf management program Phase I and Phase II would not cause a significant environmental impact. Plaintiffs challenge that finding, arguing that the agency violated the National Environmental Policy Act (NEPA) by failing to appropriately analyze the impact of its actions in the EA and by failing to prepare an Environmental Impact Statement (EIS). Plaintiffs seek a declaration from the court that Defendant violated NEPA, and they ask the court to vacate the findings of the EA and enjoin Wildlife Services from engaging in wolf management in Oregon until it complies with NEPA.

Defendants David Williams, USDA-APHIS Wildlife Services, and United States Department of Agriculture respond with cross-motions for summary judgment on four points: (1) Cascadia Wildlands lacks standing; (2) Cascadia Wildlands has an adequate remedy in state court; (3) NEPA does not apply because Wildlife Services has not engaged in a major federal action; and (4) Wildlife Services analyzed the impact of its actions in the EA and reasonably concluded that their actions would not significantly impact the environment.

After review of the parties' briefing, underlying record, and oral arguments, the Court finds that (1) Wildlife Services' activities in Oregon do not constitute major federal action, (2) the agency's finding of no significant impact was based on a hard look at the consequences of the proposed action, and (3) no EIS was required.

---

[1] U.S. Department of Agriculture-Animal and Plant Health Inspection Service (USDA-APHIS) Wildlife Services,is a federal agency within the U.S. Department of Agriculture.

During the course of this litigation Oregon's wolf management plan moved out of Phase II and into Phase III. Because the Court does not find that moving out of Phase II has rendered the issues in this case moot, the Court reaches its ruling on the merits. Plaintiffs' motion for summary judgment (ECF No. 20) is DENIED. Defendants' cross motion for summary judgment (ECF No. 27) is GRANTED in part.

## FACTUAL BACKGROUND

Since the re-introduction of gray wolves to Yellowstone National Park in 1995, wolf populations have been growing and migrating throughout the northern Rocky Mountains and into neighboring states. After a nearly sixty year absence, wolves returned to Oregon in 1999. As a result of this renewed and increasing presence, the state of Oregon developed and issued the Oregon Wolf Conservation and Management Plan (Oregon Wolf Plan) in 2005, updating the plan in 2010. The intent of the Oregon Wolf Plan is to balance wolf conservation interests with local social and economic interests and to minimize conflict between wolves and livestock. AR 14. The Oregon Wolf Plan manages wolves in the geographical eastern third of Oregon.[2] Because wolves in this area were delisted as endangered under the federal Endangered Species Act in 2001, 74 Fed. Reg. 25590, at 15125, the state of Oregon retains exclusive jurisdiction to manage wolves in this area.

Oregon's wolf management plan is comprised of three phases, each one based on the population of wolves and number of breeding pairs in the state. As the wolf population grows and breeding pairs increase, the proposed management practices and federal involvement change under the plan. Phase I of the plan remained in place until there were at least four breeding pairs

---

[2] The geographical area covers the area of Oregon east of Highway 395 and Highway 78 north of Burns Junction and that portion of Oregon east of highway 95 south of Burns Junction. The gray wolves in this area are part of the Northern Rockies Distinct Population Segment. *See* AR 20.

3 – OPINION AND ORDER

in eastern Oregon for three consecutive years. The plan moves from Phase II to Phase III when there are at least seven breeding pairs in Oregon for three consecutive years. The Environmental Assessment at issue in this case analyzed defendants' actions under Phase I and II. Defendants would need to begin a new EA/ESI process before deciding to participate or not in Phase III. This lawsuit was filed at a time when the wolf plan was operating under Phase II. On March 7, 2017, after oral arguments on the summary judgment motions and cross-motions, Defendants filed a "Notice of administrative development" (ECF No. 39) announcing that the State of Oregon has moved into Phase III of the wolf management plan at which point parties submitted addition legal briefing on the issue of mootness.

**Prior litigation**

In September 2009, at the request of the Oregon Department of Fish and Wildlife (ODFW), Wildlife Services lethally removed two gray wolves in Oregon. AR 64; Compl. ¶ 39, ECF No. 1; Answer ¶ 39, ECF No. 13. Wildlife Services acts as a contractor with other federal agencies, non-federal government agencies, and private landowners to manage wildlife that may be damaging agricultural and ranching interests. In May 2010, ODFW authorized Wildlife Services to kill two additional wolves in Oregon. Compl. ¶ 40, ECF No. 1; Answer ¶ 40, ECF No. 13. Before those wolves were lethally removed several conservation groups, including some of the Plaintiffs in this case, filed suit against Wildlife Services alleging that Wildlife Services' participation in wolf removal, absent an analysis of the environmental effects, was a violation of NEPA.[3] Wildlife Services agreed to stay their wolf removal activities until they had conducted a NEPA analysis of their participation in Oregon's wolf removal plan under Phase I and II. Wildlife Services issued its pre-decision Environmental Assessment in July 2012 and solicited

---

[3] *See Hells Canyon Preservation Council v. Williams, et al.*, Case No. 3:10-cv-759-BR (D. Or. July 1, 2010).

public comment on the proposal and environmental analysis. AR 547. In July 2014 Wildlife Services issued a Decision Notice and Finding of No Significant Impact (DN/FONSI).

In addition to the federal suit discussed above, Plaintiffs brought an action in 2011 against the Oregon Fish and Wildlife Commission and the Oregon Department of Fish and Wildlife in state court arguing the Oregon Wolf Plan violated the Oregon Endangered Species Act.[4] Def.'s Cross-Mot. Ex. A, ECF No. 27-1. As the result of a settlement agreement, Oregon worked with the conservation groups to amend its administrative rules related to the plan. AR 19. For example, the amended plan under the settlement agreement increased from two to four the number of confirmed depredation events before lethal take is allowed. ODFW must first identify depredating wolves before authorizing any action to remove those wolves in accordance with the Oregon Wolf Plan. OAR 635-110-0010, -0020.

## STANDARD OF REVIEW

The court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). An issue is "genuine" if a reasonable jury could return a verdict in favor of the non-moving party. *Rivera v. Phillip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is "material" if it could affect the outcome of the case. *Id.* The court reviews evidence and draws inferences in the light most favorable to the non-moving party. *Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006) (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)). When the moving party has met its burden, the non-moving party must present "specific facts showing that there is a genuine issue for trial."

---

[4] *Cascadia Wildlands v. Oregon Fish & Wildlife Comm'n.*, A-149672 (Or. Ct. App. Oct. 5, 2011).

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (quoting Fed. R. Civ. P. 56(e)).

## DISCUSSION

### I. Standing

As an initial matter, Defendants argue that Plaintiffs lack Article III standing to bring their claims because Plaintiffs cannot meet their burden in demonstrating: (1) that Plaintiffs suffered an injury-in-fact that is concrete and particularized, and actual or imminent, (2) that there is a casual connection between the injury and the conduct complained of, and (3) that a favorable decision would likely redress that injury. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-561 (1992); *WildEarth Guardians v. U.S. Dep't of Agric.*, 795 F.3d 1148, 1154 (9th Cir. 2015). When the injury-in-fact is a result from a procedural failure, the standards for causation and redressability are "relaxed" to the extent that a plaintiff need not demonstrate that requiring the procedure would *certainly* result in alleviating a concrete and particular injury-in-fact. *WildEarth Guardians*, *supra*, 795 F.3d at 1154; *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 485 (9th Cir. 2011). The Court finds Cascadia Wildlands has met all three requirements to establish Article III standing.

### A. Injury-in-fact

Plaintiffs adequately alleged injury-in-fact through the submission of declarations from six of its individual members. ECF No. 21-26. The declarations establish for purposes of standing that the individuals have viewed or heard or attempted to view or hear wolves in the affected area. The declarations establish that wolf removal decreases the likelihood of being able to see or hear wolves, negatively affecting the aesthetic and recreational value of the area. *See*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183 (2000)

("[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons for whom the aesthetic and recreational values of the area will be lessened by the challenged activity.")).

One of the six declarants, Walter Sykes, a Cascadia Wildlands member, has lived in Wallowa County for 21 years where he regularly enjoys the wildlife, including looking for signs of wolves in the area. Sykes Decl. 1-3; ECF No. 24. Mr. Sykes has seen and heard wolves on numerous occasions: in the fall of 2010 he observed eight wolves of the Imnaha Pack in the Big Sheep drainage of the Eagle Cap Wilderness; in 2013 he observed wolf OR4 of the Imnaha Pack in the Wallowa-Whitman National Forest; in 2015 he observed and filmed OR4's son (wolf OR33) in the same forest. *Id*. at 3.

A second declarant, Greg Dyson of WildEarth Guardians, declares to have "aesthetic, recreational, and inspirational interests in wolves in Northeast Oregon." Dyson Decl. 4, ECF No. 22. Mr. Dyson regularly backpacks and camps in Northeast Oregon, including the Wallowa's and Hells Canyon, hoping to see or hear wolves, as well as other wildlife. *Id*. at 2. Mr. Dyson also ran the wolf protection program for a conservation organization based in LaGrande, Oregon, and worked with the Oregon Department of Fish and Wildlife on wolf issues. *Id*. at 3. The other four declarants have had similar interests in recreating in eastern Oregon in the past and hope to enjoy either seeing or hearing the wolves and other wildlife in the future.

**B. Causation**

Cascadia Wildlands meets the causation requirement by demonstrating that Wildlife Services has removed wolves in Oregon and, as a result "is at least partially causing the alleged injury . . . even if [it is] just one of multiple causes of the plaintiff's injury." *WildEarth Guardians*, *supra*, 795 F.3d at 1157. Wildlife Services argues that any alleged injury is caused

by the State of Oregon via the Oregon Wolf Plan. Def.'s Cross-Mot. 16-17, ECF No. 27 ("Only Oregon may authorize 'the lethal take of wolves under their management authority.' AR 7.") The Oregon Wolf Plan created under Oregon regulation OAR 635-110 authorizes the Oregon Department of Fish and Wildlife to determine when a wolf may be removed within the standards of the regulations and to then request assistance from Wildlife Services.

While the Oregon Wolf Plan sets the standards and while the ODFW must request assistance, Wildlife Services is still a link within the chain of causation which can cause the physical or lethal removal of a wolf or wolves from the area. *See Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 849 (9th Cir.), *opinion amended on denial of reh'g*, 312 F.3d 416 (9th Cir. 2002) (A chain of causation may have more than one link and still retain plausibility); *see also*, *WildEarth Guardians*, *supra*, 795 F.3d at 1157 ("So long as a defendant is at least partially causing the alleged injury, a plaintiff may sue that defendant, even if the defendant is just one of multiple causes of the plaintiff's injury."). Because Wildlife Services has discretion over whether it will conduct the removal and the method of capture or lethal removal, its conduct has a causal connection to the alleged injury.

## C. Redressability

Plaintiffs' allegations meet the redressability requirement because Wildlife Services, if required to prepare an EIS, may choose an alternative action or refrain from engaging in wolf capture or lethal removal in Oregon. Compl. 18-21, ECF No. 1. When a plaintiff has suffered an injury due to a procedural failure, plaintiffs only need to show that the exercise of that procedural right *could* protect their concrete interests. *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007) (The redressability requirement for procedural injury claims is met "if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly

harmed the litigant"); *WildEarth Guardians*, *supra*, 795 F.3d at 1154 (quoting *Salmon Spawning & Recovery Alliance v. Gutierrez*, 545 F.3d 1220, 1226 (9th Cir 2008) (emphasis in original)) (Plaintiffs need only show that the exercise of the procedural right "*could* protect their concrete interests"). Also, redressability, like causation, can be established even if the defendant is just one of multiple causes of the plaintiff's injury. *WildEarth Guardians*, 795 F.3d at 1157.

The conclusions of the EA and DN/FONSI allow Wildlife Services to manage wolf populations on behalf of Oregon Department of Fish and Wildlife and also on behalf of the Confederated Tribes of the Umatilla Indian Reservation. If required to perform an EIS, Wildlife Services could reach a different conclusion requiring the agency to change its methods of capture or refrain completely. This may in turn affect the extent and manner in which ODFW and the Confederated Tribes manage the wolf population. Without Wildlife Services' expertise and resources, ODFW and the Confederate Tribes may be less efficient and less capable of performing lethal and non-lethal management.

## II. Mootness

Wildlife Services' Environmental Assessment was limited to the agency's activities conducted during Phase I and II of the Oregon Wolf Plan. Because of this, Plaintiff's Complaint challenges Wildlife Services' conclusions only as to their involvement in Phase I and II. On March 7, 2017, because of the sustained wolf population and increase in breeding pairs over the last three consecutive years, Oregon announced that the Wolf Plan has now moved to Phase III. If Wildlife Services decides to assist in Phase III at some time in the future, they will need to undergo a new NEPA process to include conducting a new environmental assessment. Wildlife Services role, if any, in Phase III of the Oregon Wolf Plan is not the subject of this litigation.

This development, however, raises the issue of mootness. Is there is still a present controversy to resolve and, should the Plaintiffs prevail, is effective relief still available? Article III requires a "live controversy [to] persist throughout all stages of the litigation." *Gator.com Corp. v. L.L. Bean*, 398 F.3d 1125, 1128-29 (9th Cir. 2005) (en banc); *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d 986, 989 (9th Cir. 1999) ("The Requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."). "Where this condition is not met, the case has become moot, and its resolution is no longer within our constitutional purview." *Id*. However, the issue of mootness must be shown to be "absolutely clear" that the allegedly wrongful behavior will not recur if the lawsuit is dismissed. *Rosemere Neighborhood Ass'n v. U.S. Envtl. Prot. Agency*, 581 F.3d 1169, 1173 (9th Cir. 2009), *citing Laidlaw Envt'l Servs. (TOC), Inc.*, *supra*, 528 U.S. 167, 189 (2000).

The situation here is not one where the challenged activity has been completed by defendant. In those situations courts will decline to render a NEPA case moot on policy and judicial expediency grounds, so long as any effective relief could still be granted. *See*, *Neighbors of Cuddy Mtn. v. Alexander*, 303 F.3d 1059, 1065-66 (9th Cir. 2002). This is also not a situation where a defendant has voluntarily ceased the challenged practice, nor is it akin to a statutory change. *See*, *Native Vill. of Noatak v. Blatchford,* 38 F.3d 1505, 1510 (9th Cir.1994) (a statutory change is "*usually enough* to render a case moot, even if the legislature possesses the power to reenact the statute after the lawsuit is dismissed."); *see also Smith v. Univ. of Wash., Law Sch.,* 233 F.3d 1188, 1194–95 (9th Cir.2000) ("[I]t is generally fair to say that when a change of position is wrought by a statutory provision, the change is neither voluntary nor likely to be resiled from at any time in the foreseeable future."). No statutes or administrative rules here have changed. The State of Oregon is simply implementing the Wolf Plan rules currently in place.

The determinative question is whether the Oregon Wolf Plan, now in Phase III, is capable of reverting back to either of the two earlier phases if the wolf population declines. While wolf populations in eastern Oregon increased from 12 wolves with 1 breeding pair in 2009 to 112 wolves with 8 breeding pairs in 2016, future wolf population and breeding pairs could plausibly decline rather than expand. Plaintiffs argue this very point, directing attention to the fact that the rate of wolf population growth has declined significantly from 2015 to 2016, with the actual number of breeding pairs decreasing from 11 in 2015 to 8 pairs in 2016. The Oregon Department of Fish and Wildlife's draft 2016 Wolf Annual Report shows wolf population in eastern Oregon over the last seven years:



Figure 2. Minimum wolf population in Oregon in (2009-2016).

Figure 3. Number of packs and breeding pairs Oregon (2009-2016).

*Oregon Department of Fish and Wildlife* – Draft *2016 Wolf Annual Report*[5]

---

[5] ODFW's annual Oregon Wolf Conservation and Management Reports are available at: http://www.dfw.state.or.us/Wolves/annual_reports.asp, last accessed April 21, 2017.

| Wolf population in eastern Oregon | | |
|---|---|---|
| Year | Population | Breeding Pairs |
| 2009 | ~12 wolves | 1 breeding pair |
| 2010 | ~21 wolves | 2 breeding pairs |
| 2011 | 29 wolves | 1 breeding pair |
| 2012 | 46 wolves | 6 breeding pairs |
| 2013 | 64 wolves | 4 breeding pairs |
| 2014 | 81 wolves | 9 breeding pairs |
| 2015 | 110 wolves | 11 breeding pairs |
| 2016 | 112 wolves | 8 breeding pairs |

Plaintiffs assert that if the number of breeding pairs declines to fewer than seven breeding pairs, then Oregon will return to Phase II of the Oregon Wolf Plan. Pl.'s Br. 6, ECF No. 43. In support of their position, Plaintiffs submit a copy of an email exchange dated March 13, 2017 between Plaintiff and Russ Morgan, the Wolf Program Coordinator with the Oregon Department of Fish and Wildlife. In the email, Mr. Morgan states that it is his understanding under the current wolf plan that, "if we drop to fewer than 7BP's [breeding pairs] in eastern Oregon we would automatically be in Phase II." Cady Decl. Ex. 1, ECF No. 44-1.

Defendants' position on the issue of mootness implies that the Oregon Wolf Plan is designed to be progressive, moving from Phase I to Phase II and from Phase II to Phase III as the wolf population increases and the Plan does not contemplate the contingency of reverting from Phase III to Phase II or from Phase II to Phase I if wolf population declines. Because the Wolf Plan has now progressed to Phase III, the Plan will never revert back to Phase I or Phase II. Defendant argues that there is no possible scenario where Wildlife Services will engage in the future in wolf management under the challenged environmental assessment and DN/FONSI.

Certainly the goal of the Oregon Wolf Plan is to increase the wolf population, number of

wolf packs, and number of breeding pairs. The administrative rules define the three phases as: Phase I (Conservation: 0-4 breeding pairs); Phase II (Management: 5-7 breeding pairs); and Phase III (more than 7 packs). The administrative rules do not state how one phase may progress or regress from one to another and a plain reading of the administrative rules reads simply that Oregon will operate under the phase reflected by the number of breeding pairs. OAR 635-110-0010(1), -0020(1), -0030(1).

The Oregon Wolf Conservation and Management Plan itself, incorporated into the administrative rules by reference, does supply some detail. AR 7563-7757.[6] The Wolf Plan as a whole reads as a progression, discussing when and how to move forward from Phase I to Phase II and from Phase II to Phase III. AR 7598-99. Section II-B, "Management Phases and Population Objectives" describes the three phases by the number of breeding pairs as outlined in the administrative rules. Only one subsection addresses the possible scenario that wolf population may decline.[7] That subsection does not discuss a regression from Phase III to Phase II or from Phase II to Phase I. Instead, the subsection discusses how the Gray Wolf will be delisted from the Oregon Endangered Species Act at the completion of Phase I and how, if there is a later decline in the wolf population, ODFW "may request a status review by the Commission" to determine whether relisting is appropriate. AR. 7599. In the event of a gradual decline, there will be a one-year monitoring effort to determine if a request for a status review is needed. *Id*.

I do not believe that there is a clear answer as to whether the Oregon Wolf Plan, once in Phase III, is capable within its own rules of reverting back to either Phase I or Phase II. That being said, I think it is possible. This reversion may or may not be automatic, but it is possible.

---

[6] Oregon Wolf Conservation and Management Plan is available at: http://www.dfw.state.or.us/Wolves/management_plan.asp, last accessed April 21, 2017.
[7] Entitled "Strategies for Addressing Wolf Population Decline/Potential for Future State Relisting

Oregon may re-list the gray wolf under the state's Endangered Species Act and may convert back to the plan's conservation phase (Phase I) if wolf population declines. Oregon could also revert to the management practices under Phase II. Because the issue of mootness cannot be shown to be "absolutely clear," I find there is still a live and present controversy to resolve.[8]

**III. National Environmental Policy Act (NEPA)**

The National Environmental Policy Act (NEPA) has the stated goal of "encourag[ing] productive and enjoyable harmony between man and his environment," 42 U.S.C. § 4321, and among other things, to "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331. To achieve its goals, NEPA requires agencies to analyze "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). When an agency is unsure whether an action will have a significant impact on the human environment it may prepare an Environmental Assessment, a concise document designed to help an agency determine whether a more in depth analysis is required. 40 C.F.R. § 1508.9(a)(1). In preparing an environmental assessment, the agency must take a "hard look" at all foreseeable direct, indirect, and cumulative impacts of the proposed action, *Ctr. For Biological Diversity v. Salazar*, 695 F.3d 893, 916–17 (9th Cir. 2012), and provide enough evidence and analysis to determine whether a more in depth analysis is necessary, *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1239 (9th Cir. 2005).

If, after taking a "hard look" at the impacts of the proposed action in the environmental assessment, the agency determines that the action will have a significant impact, the agency must provide a more detailed analysis of the action in an Environmental Impact Statement. 40 C.F.R.

---

[8] I am also aware that if I were to rule in Defendants' favor on mootness, the Plaintiffs would have to first visit the appellate courts on this matter without the benefit of a ruling on the merits.

§ 1501.4(C); 40 C.F.R. § 1508.11. On the other hand, if the agency determines through an environmental assessment that the proposed action will not have a significant environmental impact, it may issue a Finding of No Significant Impact in lieu of an Environmental Impact Statement. 40 C.F.R. § 1501.4(e); 40 C.F.R. § 1508.9(a)(1); 40 C.F.R. § 1508.13. If the agency decides not to prepare an Environmental Impact Statement, it must provide "a convincing statement of reasons to explain why a project's impacts are insignificant." *Nat'l Parks & Conservation Ass'n v. Babbitt*, 241 F.3d 722, 730 (9th Cir. 2001). An agency's decision not to prepare an Environmental Impact Statement is evaluated under the Administrative Procedure Act's (APA) arbitrary and capricious standard. *Id.*; 5 U.S.C. § 706(2)(A) (stating that an agency decision may be set aside when it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law").

## A. Major Federal Action

Because NEPA applies only to "major Federal actions significantly affecting the quality of the human environment," a preliminary question is whether Wildlife Services' involvement with wolf removal as part of Oregon's Wolf Plan Phase I and II is enough to render it a "major federal action." If its involvement does not constitute major action, then Wildlife Services would not be required to perform an Environmental Impact Statement. *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 328 (9th Cir. 1975) ("NEPA limit[s] the act's scope to major 'federal' actions."). In determining if there is major federal action a court will look at the level of federal funding involved and whether there is requisite control. *See Ka Makani 'O Kohala Ohana Inc. v. Dep't of Water Supply*, 295 F.3d 955, 959 (9th Cir. 2002) (stating that, to determine whether an agency action is a major federal one, the Court must look both to the federal funding involved and the degree of federal control). In the case *Friends of the Earth v. Coleman*, the Ninth Circuit

declined to find major federal action where a state project was receiving less than ten percent of its funding from federal sources. 518 F.2d 323, 329 (9th Cir. 1975). Here federal funding contributed approximately eight percent of the cost of implementing the Oregon Wolf Plan in 2012 and 2013. Def.'s Cross-Mot. 24, ECF No. 27.

When looking at requisite discretionary control, for an agency action to be considered a major federal action, "the federal agency must possess actual power to control the nonfederal activity." *Ka Makani*, 295 F.3d 955, 961 (9th Cir. 2002). In *Friends of the Earth*, for example, the Ninth Circuit dismissed a NEPA claim when the state was acting to remodel an airport and the United States was just assisting. The court found the only relevant decision makers to be local officials. Here the Oregon Wolf Plan is a state-run program implemented through state administrative rules and led by the Oregon Department of Fish and Wildlife. ODFW retains the authority to make decisions on whether a wolf has engaged in livestock predation warranting lethal or non-lethal removal of the identified wolf, and overall wolf population management in eastern Oregon. Within this Oregon state regulatory framework, Wildlife Services' only discretion is to decide whether to accept or not a request to remove a wolf. Wildlife Services' action is limited to the wolf identified by ODFW and to using only the most effective method to remove the wolf as limited by the Oregon Wolf Plan. AR. 28. Wildlife Services' minimal amount of discretion does not render its action a 'major federal action.' *See Nat'l Ass'n of Home Builders v. Defs. Of Wildlife*, 551 U.S. 644, 668 (2007) ("Agency discretion presumes that an agency can exercise 'judgment' in connection with a particular action."), *see also*, *Ka Makani*, *supra*, 295 F.3d at 961 (The federal agency must possess actual power to control the nonfederal activity.) Because Wildlife Services provided only marginal federal funding and lacks the requisite discretionary control, Wildlife Services' actions in assisting with wolf removal as part

of Oregon's Wolf Plan does not constitute 'major federal action' and NEPA does not apply. An Environmental Impact Statement is not required.

## IV. Sufficiency of the Environmental Assessment

Even if NEPA did apply, this Court finds that Wildlife Servicers met its requirement under NEPA to take a hard look at the impacts of its action in the Environmental Assessment and provided a convincing statement of reasons for why its participation in the Oregon Wolf Plan would not significantly impact the environment. When determining whether an agency action will significantly impact the environment, an agency must consider ten factors in evaluating the severity of a proposed action's impact. These factors are: (1) whether the impact is beneficial or adverse; (2) the impact on public health and safety; (3) "[u]nique characteristics of the geographic area;" (4) "[t]he degree to which the effects on the quality of the human environment are likely to be highly controversial;" (5) "[t]he degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks;"(6) the precedential effect of the action; (7) the cumulative effects of the action; (8) the effect on "scientific, cultural, or historical resources;" (9) the adverse effect on endangered or threatened species under the ESA; and (10) "whether the action threatens a violation of Federal, State, or local law." 40 C.F.R. § 1508.27(b)(1)–(10).

Wildlife Services' analysis of the impact of its proposed action determined that its participation in the Oregon Wolf Plan would not result in a net decrease in wolves. This is because of the state's own current wolf removal activities, legal and illegal removal by individuals, and the nature of wolves themselves. AR 55–56. As an aside, Wildlife Services has not actually assisted Oregon with any lethal wolf removals under the challenged environmental assessment and July 2014 Decision Notice and Finding of No Significant Impact. The agency

last lethally removed two wolves in 2009. All wolf removal since 2009 has been conducted by Oregon or by private individuals. The Environmental Assessment cites two studies to show that wolf populations can sustain heavy losses at the hands of humans, between thirty and fifty percent mortality rates, without experiencing a "decline[] in abundance." AR 55. The Assessment also cites studies of the growth in size and territory range of small packs in other, similar locations to support its determination that wolf populations are expected to grow in Oregon. AR 67–68. It was also determined that the chance of capturing or killing animals such as Canada lynx or wolverine is low due to their rarity, the selectivity of traps used, and the skill of Wildlife Services and ODFW at determining the best method of removal to use. AR 71–72. Some species that may get caught in traps, such as coyotes or foxes, can withstand high harvest levels without an impact on the species due to their abundance. AR 72.

Plaintiffs challenge the Assessment's analysis on five of the relevant factors: (1) the impact on public health and safety; (2) the unique characteristics of the geographic area; (3) the controversial nature of the action (4) the uncertainty or unknown risks of Wildlife Services' action; and (5) the cumulative effects of the action. The Court addresses each of the challenged factors in turn.

In analyzing the risks to public health and safety, the Assessment looked to Wildlife Services' activities in other states and the results of several United States Department of Agriculture studies of Wildlife Services' methods. AR 89. Aerial shooting is highly selective, traps and snares are surrounded by warning signs, and each of these methods occur in "relatively remote areas with no or very low human presence on the ground." AR 89. The Environmental Assessment rationally concludes that the risks to public health and safety are not significant.

In assessing the unique characteristics of the geographic area, the Environmental Assessment concluded that removals would be expected to occur in limited geographic areas because of the distribution of wolves in Oregon. AR 26. Removals would not occur in National Parks or Monuments and any removal in Wilderness Study Areas would only be approved by the U.S. Forest Service if removal "would not diminish wilderness value." AR 57. The Court finds the scope of analysis of this factor is appropriate.

Although Plaintiffs assert that Wildlife Services removal of wolves is highly controversial and involves uncertain or unknown risks, the Court is not persuaded. With respect to the controversy factor, the Court's review of studies provided by Cascadia Wildlands shows that they do not directly contradict determinations made in the Environmental Assessment. Though some of the studies conclude that wolf removal may not have the desired long term effects, one study cited by Cascadia Wildlands states that "wolf removal might play a management role by facilitating elimination of genetic or behavioral traits conducive to depredation." AR 460. Another study explicitly states that killing adult male wolves was the most effective method of controlling depredation in some cases. AR 444–45. That Cascadia Wildlands and others disagree with Wildlife Services' ultimate determination of no significant impact does not render the proposed action highly controversial. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212 (9th Cir. 1998).

Related to uncertain or unknown risks, Wildlife Services has been engaged in wildlife management "for more than 100 years." Compl. ¶ 31 on page 13-14, ECF No. 1. Considering Wildlife Services' experience and expertise in this area, the agency is not contemplating "a new type of activity with completely unknown effects on the environment." *See Winter v. Natural Resources Defense Council*, 555 U.S. 7, 23 (2008). The Environmental Assessment cites several

studies and looks to wolf population growth in other regions to demonstrate that the effects of the agency's proposed actions are not uncertain or unknown. The Environmental Assessment adequately analyzed the controversy and uncertainty factors.

The Assessment also discusses the cumulative impact that Wildlife Services' actions, along with the actions of ODFW and individual farmers who may remove wolves legally or illegally, will have on the wolf population as a whole. AR 61–71. Wildlife Services relates their cumulative effects analysis back to its finding that, due to the high reproductive rates of wolves and the ample prey and territory in eastern Oregon, wolf populations are expected to grow despite wolf removal, regardless of the source. The analysis took a hard look at the agency's cumulative impact.

## **CONCLUSION**

Because Wildlife Services' actions in assisting with Oregon's Wolf Plan do not constitute major federal action, NEPA does not apply. Even if NEPA were to apply, Defendants took a 'hard look' at the proposed action in reaching its finding of no significant impact and no Environmental Impact Statement is required. Plaintiffs' motion for summary judgment (ECF No. 20) is DENIED. Defendants' cross motion for summary judgment (ECF No. 27) is GRANTED in part.

IT IS SO ORDERED.

Dated this 27th day of April, 2017.

                                               s/ Michael J. McShane
                                                     Michael McShane
                                               United States District Judge